*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-PR-0616

IN RE EDWARD T. SMITH; BRUCE E. GARDNER, APPELLANT.

Appeal from the Superior Court
of the District of Columbia
(1958-CON-000101)

(Hon. Gerald I. Fisher, Trial Judge)

(Submitted January 11, 2022                    Decided December 14, 2023)

*Bruce E. Gardner*, pro se.

*Karl A. Racine*, Attorney General for the District of Columbia at the time of submission, *Loren L. AliKhan*, Solicitor General at the time of submission, *Caroline S. Van Zile*, Principal Deputy Solicitor General at the time of submission, *Ashwin P. Phatak*, Deputy Solicitor General at the time of submission, and *Stacy L. Anderson*, Senior Assistant Attorney General, filed a brief on behalf of the District of Columbia as *amicus curiae*.

Before BECKWITH and MCLEESE, *Associate Judges*, and GLICKMAN,[*] *Senior Judge*.

GLICKMAN, *Senior Judge*: In 1998 and 2010, the Superior Court appointed

Bruce E. Gardner to serve as conservator on behalf of the estate or person of Edward

---

[*] Judge Glickman was an Associate Judge of the court at the time of submission. He began his service as a Senior Judge on December 21, 2022.

T. Smith. Mr. Smith, who was civilly committed in 1958, passed away in September 2013. This is Mr. Gardner's fourth appeal of a Superior Court determination regarding his entitlement to compensation for his service to Mr. Smith.

In the first appeal ("*Smith I*"), this court clarified issues relating to the statutory basis for Mr. Gardner's appointment and held that he was eligible from his 2010 appointment onward for compensation from the Guardianship Fund pursuant to the District of Columbia Guardianship, Protective Proceedings, and Durable Power of Attorney Act of 1986, D.C. Code §§ 21-2001 to -2077.[1] In the second appeal ("*Smith II*"), we held that Mr. Gardner could be awarded reasonable compensation from the Fund for litigating the first appeal.[2] In his third appeal ("*Smith III*"), on motion by the Attorney General on behalf of the District, this court vacated an October 3, 2016, fee award and remanded the case to the Superior Court for additional findings relating to the amount of compensation that Mr. Gardner had been awarded.[3] The present, fourth appeal, is from the Superior Court's June 7, 2019, fee award on remand. This award covered services rendered by Mr. Gardner

---

[1] *In re Smith*, 99 A.3d 714, 715 (D.C. 2014) (*Smith I*).

[2] *In re Smith*, 138 A.3d 1181, 1182 (D.C. 2016) (*Smith II*).

[3] *In re Smith*, No. 16-PR-1109 (D.C. June 7, 2018) (order) (*Smith III*).

from June 2012 to February 2016 (including, but not limited to, his appeals in *Smith I* and *II*).

The District was not a party in the proceedings in Superior Court. However, in *Smith I*, this court invited the Attorney General to participate in the appeal on behalf of the District as an amicus. The Attorney General accepted the invitation, and since then the District has participated in Mr. Gardner's subsequent appeals in Mr. Smith's matters. It is participating in this appeal without objection; Mr. Gardner identified the Attorney General as "appellee's counsel" in his notice of appeal. Technically, however, the District participates as an amicus. It does so with this court's appreciation.

Mr. Gardner raises the following issues. First, he contends that this court did not have subject-matter jurisdiction in *Smith III* to remand the case for further findings relating to compensation requests that the Superior Court had approved. This is so, he argues, because his notice of appeal limited the scope of the appeal to "the part of the October 3, 2016 order that denied his compensation/fees as medical guardian" and the District had not cross-appealed to challenge other parts of the order. Accordingly, Mr. Gardner asserts, the Superior Court's downward correction on remand of compensation that it had approved in October 2016 must be set aside.

Second, Mr. Gardner contends the Superior Court erred in ordering that he be paid from the Guardianship Fund (at the Fund's lower hourly rate) without first

depleting Mr. Smith's funds (from which Mr. Gardner might have received payment at a higher hourly rate). Third, Mr. Gardner challenges the reasonableness of the Guardianship Fund rate cap of $90 per hour. Fourth, Mr. Gardner argues that, because the Superior Court did not decide his fee petitions within thirty days, in accordance with former Superior Court Probate Rule 308(i)(1), the petitions should have been accepted as filed and paid in full, together with interest and other relief for the consequences of the delay. Lastly, Mr. Gardner contends the Superior Court abused its discretion in reducing his compensation for appellate work in *Smith I* and *II* and in other respects.

## I.

### A. Background

In 1958, the United States District Court for the District of Columbia granted a petition for the civil commitment of Edward T. Smith upon determining that he was of "unsound mind" and in need of hospitalization.[4] In 1972, following court reorganization in the District of Columbia, Mr. Smith's case was transferred to the Superior Court.[5] He remained a ward of the Superior Court from then until his death

---

[4] *Smith I*, 99 A.3d at 715.

[5] *Id.* at 716.

in September 2013, even though he left the District of Columbia in 1962 and never returned to this jurisdiction.[6]

In May 1998, the Superior Court appointed Bruce Gardner to serve as a successor "conservator" for Mr. Smith's estate.[7] At that time, Mr. Smith was 78 years old and had been living for several years in a psychiatric facility in New York paid for by the Veterans Administration ("VA"). At some point, he was moved to a nursing home in New York, where he remained at all times relevant to this appeal until his demise. According to Mr. Gardner's reports, fee petitions, and other representations in this case, Mr. Smith's sole sources of income were his VA and social security benefits; he was a Medicaid beneficiary or eligible for Medicaid; and the VA paid for his nursing home care.

Mr. Smith's social worker informed Mr. Gardner that no one had been serving as Mr. Smith's guardian and that his doctors had been making all medical decisions for him. In 2009, after Mr. Gardner recommended that a medical guardian be appointed for Mr. Smith, Superior Court Judge Burgess directed Mr. Gardner to file a petition for guardianship as the necessary first step to filing a petition to transfer Mr. Smith's guardianship to New York. Mr. Gardner agreed to do this. He filed a

---

[6] *See id.* at 716-18.

[7] *Id.* at 716-17.

petition to be appointed guardian, but the court dismissed it in July 2009 because Mr. Gardner had not properly served Mr. Smith personally. Mr. Gardner did not pursue the matter further (though he visited Mr. Smith regularly and could have served him in person) and made no effort to transfer supervision of Mr. Smith's estate or person to New York.

On June 7, 2010, the Superior Court issued a supplemental order appointing Mr. Gardner "conservator of the person of" Mr. Smith.[8] In 2011, the court terminated the conservatorship of Mr. Smith's estate, but directed that the conservatorship of his person continue.[9] Mr. Gardner remained Mr. Smith's conservator until Mr. Smith died in September 2013.[10]

## B. *Smith I* and *Smith II*

In *Smith I*, Mr. Gardner sought review in this court of Superior Court orders that had denied him compensation from the Guardianship Fund on the ground that he was not appointed under and in compliance with the Guardianship Act.[11] We

---

[8] *Id.* at 717-18. Mr. Gardner refers to this appointment as a "medical guardianship," and his position as Mr. Smith's "medical guardian," because that was the main focus of his responsibilities.

[9] *Id.* at 718.

[10] *Id.*

[11] *Id.* at 719.

held that Mr. Gardner was ineligible to receive compensation from the Guardianship Fund for services rendered under his original appointment in 1998 up until June 2010, but that his appointment in June 2010 as conservator of the person was "properly construed to have been made pursuant to the Guardianship Act," and that he was "eligible to receive compensation from the Guardianship Fund" for services rendered in that capacity after that appointment.[12]  We remanded the case for the Superior Court to consider Mr. Gardner's compensation petitions "anew."[13]

Mr. Gardner filed six fee petitions for his activities as Mr. Smith's conservator following his June 2010 appointment.  For convenience, we list these petitions in the following chart, arranged by the dates of the services for which he sought compensation.  The last three are the ones directly at issue in this appeal.

| Filed | Services From | Services To | Decided by Superior Court |
|---|---|---|---|
| Sept. 2011 | June 7, 2010 | Aug. 11, 2011 | Jan. 2016 (upon remand in *Smith I*) |
| July 2012 | Aug. 9, 2011 | June 22, 2012 | Jan. 2016 (upon remand in *Smith I*) |
| June 2013 | June 23, 2012 | June 18, 2013 | July 2013 (appealed in *Smith II*) |
| Jan. 2016 | June 23, 2012 | June 18, 2013 | Oct. 2016 (remanded in *Smith III*) |
| Dec. 2015 | June 20, 2013 | Jan. 22, 2014 | Oct. 2016 (remanded in *Smith III*) |
| Mar. 2016 | Jan. 23, 2014 | Feb. 29, 2016 | Oct. 2016 (remanded in *Smith III*) |

In January 2016, after the remand in *Smith I*, the Superior Court ruled on the first two fee petitions in the above chart, which Mr. Gardner had filed for the two-

---

[12] *Id.* at 722 (emphasis omitted).

[13] *Id.*

year period from his appointment in June 2010 to June 2012. In each of these petitions, Mr. Gardner requested compensation from the Guardianship Fund at the rate of $90 an hour. The petitions did not request compensation relating to his litigation of the *Smith I* appeal (other than for preparing the notice of appeal and paying the $100 filing fee). The Superior Court awarded some but not all of the fees sought. Mr. Gardner did not appeal the award.

However, in June 2013, while the appeal in *Smith I* was still pending, Mr. Gardner filed a third fee petition in Superior Court, in which he sought compensation for the period between June 23, 2012, and June 18, 2013. This petition, and the Superior Court's decision on it, set the stage for the issues raised by the three subsequent petitions that are at issue in this appeal.

In his June 2013 fee petition, Mr. Gardner sought compensation for (by his calculation) a total of 101.3 hours of work, the bulk of which related to his appeal in *Smith I*. At this time, Mr. Smith reportedly had assets in an account amounting to $11,897.72. Mr. Gardner requested that he be awarded compensation from that account at his regular hourly billing rate of $300 for 39.66 hours—which would have completely depleted the account—and that he be compensated from the Guardianship Fund for the rest of his total hours (i.e., for 61.64 hours) at the Fund's rate cap of $90 per hour.

On July 24, 2013, the Superior Court granted Mr. Gardner's petition in part. The court ruled that Mr. Gardner's hours of work on his fee petition appeal in *Smith I* were not compensable at all because that work was of no benefit to Mr. Smith. After deducting those hours and making other adjustments, the Superior Court awarded Mr. Gardner $6,000 in fees for twenty hours of non-litigation work at an hourly rate of $300, plus $1,022.96 in costs, for a total of $7,022.96. The court ordered payment of this award from Mr. Smith's estate because it would not exhaust his assets.

Mr. Gardner appealed the ruling that he could not be compensated for his work on the appeal in *Smith I*. In *Smith II*, decided in May 2016, this Court agreed with Mr. Gardner and held that the Guardianship Act "authorizes the Superior Court in its discretion to approve a petition for compensation based on a conservator's . . . fee-related appellate work, even without a showing of benefit to the particular ward."[14] Accordingly, we remanded for the Superior Court to reconsider its ruling with respect to Mr. Smith's appellate work.

---

[14] *Smith II*, 138 A.3d at 1188. However, we acknowledged that there may be circumstances in which compensation for fee-related appellate litigation will not serve the Guardianship Act's objectives, "such as where a guardian unsuccessfully pursues on appeal a claim for reimbursement that the Superior Court has rejected as unreasonable in amount, or where a conservator appeals from an order surcharging him for mismanagement of a ward's assets." *Id.* at 1186. We emphasized that "[n]othing in [our] opinion would cabin the trial court's discretion to deny such a claim." *Id.*

**C. The Three Petitions Decided After *Smith II***

We come now to the three fee petitions that are at issue in this appeal. In January 2016, Mr. Gardner filed a revised petition for the period June 23, 2012, to June 18, 2013, that was the subject of *Smith II*. The January 2016 petition sought compensation for the same services for which the Superior Court already had awarded Mr. Gardner his full fees of $6,000 plus $1,022.96 in costs from Mr. Smith's estate in July 2013; only this time, Mr. Gardner sought compensation for those services from the Guardianship Fund at a rate of $90 per hour. The January 2016 petition did not disclose that (as was later revealed) Mr. Gardner had already taken the full $6,000 in fees (and, apparently, the $1,022.96 in costs) from Mr. Smith's assets, and Judge Fisher, to whom the petition was presented, was unaware of that fact. In addition, there were several unexplained discrepancies between the hours and expenses shown in the June 2013 and January 2016 petitions. For example, the earlier petition sought compensation for a total of 101.3 hours of work, while Mr. Gardner's January 2016 petition for the same period sought compensation from the Guardianship Fund for 113.8 hours of work.

The other two petitions were filed on December 16, 2015, and March 21, 2016, respectively. The former, covering the seven months from June 20, 2013, to January 22, 2014, requested compensation for 109.6 hours, all of it from the Guardianship Fund at the $90 per hour rate. The latter, Mr. Gardner's final fee

petition, covered the two-year period from January 23, 2014, to February 29, 2016, and requested compensation for a total of 138.6 hours of work. (This included appellate work in *Smith II*.) Mr. Gardner reported that, as of the date of filing, Mr. Smith's estate contained only $4,384.17 (which reflected, though Mr. Gardner did not explain this, his aforementioned withdrawal of over $7,000 in awarded fees and expenses from the estate). As Mr. Gardner's total fee request in his March 2016 petition exceeded the residue in Mr. Smith's estate, he asked that $3,480 be paid from that estate for 11.6 hours at his $300 per hour rate, and that the balance be paid from the Guardianship Fund at $90 per hour.

On October 3, 2016, Judge Fisher ruled on the three fee petitions, and he explained the basis for his rulings in a written opinion that reviewed the entire course of Mr. Gardner's conservatorship. Judge Fisher partially denied the fees Mr. Gardner sought for the time he spent in three activities: (1) his travel to and from New York to visit Mr. Smith at his nursing home there; (2) his appeals in *Smith I* and *Smith II*; and (3) his preparation of fee petitions and for a court appearance relating to his fees.[15]

---

[15] Judge Fisher awarded all the costs that Mr. Gardner sought in each of the three petitions.

### 1. Travel to Visit Mr. Smith in New York

In the two petitions that together covered the time period from June 23, 2012, to January 22, 2014, Mr. Gardner sought fees for around 50 hours of travel time in connection with four round-trip visits he made by car to Mr. Smith in New York between December 2012 and August 2013. "On none of those visits," Judge Fisher found, "did he spend more than .6 hours with Mr. Smith. Yet for each trip he billed more than $1500.00, the overwhelming majority of which [was] attributable to travel time and expenses." These last four visits before Mr. Smith passed away were the tail end of a series of some eleven to thirteen trips to visit Mr. Smith in New York (which began after Mr. Gardner was appointed conservator of Mr. Smith's person in June 2010).[16] The judge noted that Mr. Gardner had billed over $20,000 for services and expenses associated with these trips, "of which less than $1,000.00 was for time spent seeing Mr. Smith and speaking with VA staff about his care[.]"

Judge Fisher found it "hard to discern" any benefit to Mr. Smith from the visits.[17] Mr. Gardner's biannual reports with the court on Mr. Smith's medical and

---

[16] Judge Fisher referred to eleven visits, but Mr. Gardner stated in his brief in *Smith III* that he made thirteen separate trips to New York for the purpose of visiting Mr. Smith.

[17] The judge acknowledged that D.C. Code § 21-2047(a)(1) requires a guardian to "maintain sufficient contact with the ward to know of the ward's capacities, limitations, needs, opportunities, and physical and mental health," and that D.C. Code § 21-2043(e)(2) provides that a guardian should visit a ward "a

living conditions did not suggest a need for them. His two reports covering the period from June 2012 to June 2013 stated, among other things, that he had been in communication with the nursing facility staff through correspondence and telephone calls; that Mr. Smith's mental and physical health remained unchanged; that Mr. Smith was under "regular physician's care" and being cared for by a "professional health care team" (comprising a physician, a psychiatrist, a social worker, a dentist, a podiatrist, and a dietician); that Mr. Smith's living arrangements were "good"; and that Mr. Smith had "no unmet needs" and was "content." The reports also stated that Mr. Gardner did not participate in any care planning meetings

---

minimum of one visit per month" unless the court specifies otherwise based on the ward's preferences or best interests. However, the judge explained, "[g]uardians routinely seek approval from Probate Division Judges for less frequent visits when the Ward is located far outside the District of Columbia, particularly where, as here, the Ward's medical and other needs are clearly being well taken care of and the Guardian can provide little, if any, meaningful assistance by visiting the Ward." The judge was of the view that Mr. Gardner should have petitioned the Superior Court for such approval. The judge noted that when Mr. Gardner was appointed conservator of the person of Mr. Smith in June 2010, he "assured [the court] he would serve in that role by making occasional visits to Mr. Smith, but primarily by communicating with VA staff—presumably by phone or email—about Mr. Smith's needs." "That approach was appropriate," Judge Fisher stated, "since Mr. Smith was then 90 years old and unable to communicate, had been cared for by the VA for almost two decades, VA doctors and other medical staff had been making medical decisions for him for quite some time, and Mr. Gardner had not seen or had contact with Mr. Smith since 2003."

during the covered periods (presumably because he had no concerns necessitating such involvement).[18]

Moreover, Judge Fisher found that Mr. Gardner's long-distance guardianship and consequent visits to New York should have been unnecessary. Judge Fisher faulted Mr. Gardner for failing to petition the Superior Court to transfer the supervision of Mr. Smith and his assets to New York, especially after Judge Burgess had directed him to do so in 2009.[19] If Mr. Gardner "had done as Judge Burgess directed," Judge Fisher concluded, "it is likely this case would have been transferred to New York, where the oversight of Mr. Smith would have been better and most of the cost of this case would have been avoided." Taking all this into consideration, Judge Fisher deemed it appropriate to limit the travel time for which Mr. Gardner could be compensated. The judge imposed a fifty-percent cut on travel time spent on Mr. Gardner's last four visits to Mr. Smith, resulting in a reduction of 13.3 hours

---

[18] Mr. Gardner said the same things in his final report, covering the period from June 2013 to September 2013, when Mr. Smith died at the age of 93, while also noting that Mr. Smith's condition "deteriorated" during this period.

[19] Judge Fisher noted that when he asked Mr. Gardner at a hearing in November 2015 why he had not petitioned to establish a guardianship for Mr. Smith in New York, "Mr. Gardner answered that he had not considered that option." It is difficult to understand that answer given Judge Burgess's directive, as well as Mr. Gardner's initial (unsuccessful) attempt to follow that directive by petitioning for guardianship.

from Mr. Gardner's January 2016 fee petition and a reduction of 12.3 hours from his December 2015 petition.

## 2. Appellate Work in *Smith I* and *Smith II*

Judge Fisher stated that his review of Mr. Gardner's three fee petitions revealed them to be "significantly inflated"—mainly because Mr. Gardner sought payment for spending some 250 hours on his appeals in *Smith I* and *Smith II*. The judge found this figure excessive for a number of reasons. First, the judge said that, "[h]aving read the *Smith I* and *Smith II* opinions and having reviewed the appellate briefs filed in those cases, I do not find the issues presented to be so complex that they merited nearly as much time as Mr. Gardner insists he spent." Second, "Mr. Gardner was unsuccessful in one of the two issues he raised in *Smith I*" (i.e., this court denied him compensation under the Guardianship Act for his services as conservator of Mr. Smith's estate pursuant to his appointment in 1998). Third, Mr. Gardner also sought to be compensated for various efforts he made, "all unsuccessful," to oppose the filing of, or to strike, pleadings by the District of Columbia and to obtain reconsideration or withdrawal of this court's decision on appeal.[20] Fourth, Mr. Gardner sought to be compensated at attorney rates for

---

[20] "[F]or example," Judge Fisher stated, Mr. Gardner requested payment for "2.5 hours of time for opposing the District's request for an extension of time to file its brief in *Smith I*; 3.3 hours of compensation for researching whether the Court of Appeals possessed authority to invite a party to serve as amicus and file a brief after

"administrative tasks that are either non-compensable or compensable at [a] lower hourly rate," including such clerical and secretarial tasks as "collating, filing, copying, and mailing documents."

Judge Fisher concluded that "an appropriate expenditure of time for each appeal" was 70 hours. For Mr. Gardner's appellate work in *Smith II*, the judge accordingly approved a fee award of $6,300 (70 hours at $90 per hour), which "[f]or simplicity's sake" he divided evenly between the December 2015 petition and the March 2016 petition. However, for Mr. Gardner's appellate work in *Smith I*, Judge Fisher made an adjustment that was based, in part, on a mistake of fact. Judge Fisher reasoned that Mr. Gardner was not entitled to be compensated for a full 70 hours of work in *Smith I* because he had been successful on only one of the two issues he raised in that appeal. Then, stating that Mr. Gardner already had "been paid for 36.4 hours [i.e., roughly half] of that time" as part of the January 2016 award on remand from *Smith I*, Judge Fisher decided to award him only an additional ten hours of

---

the time for seeking oral argument has passed; 2.7 hours on a motion to strike the District's brief; 8.5 hours to prepare a motion for reconsideration of the Court of Appeals' decision in *Smith I*; and 2.6 hours to prepare a motion to recall the Court of Appeals' mandate." Judge Fisher also cited Mr. Gardner's request for payment for "his time (2.0 hours) spent preparing and filing a motion to extend the time to file his own appellate briefs." The judge concluded that, "[w]hile these efforts may be perfectly appropriate litigation strategy, they did nothing to advance the substantive issues raised by the appeals and cannot reasonably be construed as fostering the availability of guardians or otherwise promoting the objectives set forth in *Smith II*." (Internal quotation marks omitted.)

compensation for his appellate work in that case ("because portions of the briefs apply to all issues raised").  But as the District concedes, Judge Fisher was mistaken in his belief that the January 2016 award (which covered the petition that Mr. Gardner had filed in September 2011 for services from June 2010 to August 2011, and which is not at issue in this appeal) encompassed appellate work in *Smith I*.  Thus, Judge Fisher erred in subtracting 36.4 hours in awarding Mr. Gardner compensation for his appellate work in *Smith I* based on the belief that Mr. Gardner previously had been compensated for those hours.

### 3.  Time Expended to Prepare Fee Petitions and for Court Appearance

Finally, Judge Fisher found that Mr. Gardner charged for "inordinate lengths of time spent in the preparation of his fee petitions and the statements of services in support of those petitions."  As the "best example" of this, Judge Fisher cited "the 28.7 hours [Mr. Gardner] claims to have spent on the preparation and filing of fee petitions and statements of services in his March 21, 2016 fee petition, which was in addition to the 7.7 hours he charged for preparing for the November 2015 hearing . . . held to address the fee petitions remanded by the decision in *Smith I*, a hearing that took approximately .5 hours."  This latter preparation included several hours of reviewing, correcting errors and defects in, and revising his earlier petitions "to anticipate questions" at the November hearing.  Judge Fisher considered it

appropriate to approve compensation for only fifty percent of this total request, i.e., 18.2 hours.

### 4. The Fee Awards

On October 3, 2016, having decided to make the foregoing reductions to Mr. Gardner's fee requests, Judge Fisher ruled as follows with respect to each of the three fee petitions; as we indicate in footnotes, the judge's calculations were partially incorrect, and they resulted in incorrectly computed fee awards.

Regarding the January 2016 fee petition, the judge said he "approved 10.0 hours for appellate work (rather than the 75.8 hours sought), 13.3 hours for travel time (rather than the 26.6 sought), and the remaining 24.2 hours[21] of compensation [that Mr. Gardner] requested ([a] total of 34.2 [sic] hours, rather than the 113.3 [sic] requested)."[22] The judge awarded $5,211.00 in fees and $1,359.00 in reimbursement of costs.

---

[21] This figure included the 20 hours for which the court previously had awarded Mr. Gardner $6,000 in fee compensation from Mr. Smith's estate, when the court considered the earlier fee petition for the same time period.

[22] The Superior Court's calculations were incorrect. The approved hours add up to 47.5 (10.0 + 13.3 + 24.2), not 34.2 hours; similarly, the hours for which the judge said Mr. Gardner sought compensation add up to 126.6 (75.8 + 26.6 + 24.2), not 113.3 hours.

With respect to the December 2015 petition, the judge said he "approved 35.0 hours for appellate work (rather than the 74.4 sought), 12.3 hours for travel time (rather than the 24.6 sought), and the remaining 22.9 hours of compensation requested ([a] total of 57.9 [sic] hours, rather than the 109.6 [sic] requested)."[23]  The judge awarded $3,078.00 in fees and $1,153.46 in costs.

As for the March 2016 petition, Judge Fisher said he "approved 35.0 hours for appellate work (rather than the 98.6 sought), 14.35 hours for preparation and filing of fee petitions and statements of services (rather than 28.7) and 3.85 hours for preparing for the November 18, 2015 hearing (rather than 7.7 hours), and the remaining 21.8 hours of compensation requested ([a] total of 56.8 [sic] hours, rather than the 138.6 requested)."[24]  The judge awarded $5,112.00 in fees and $432.00 in costs.

Judge Fisher ordered that all the payments were to come from the Guardianship Fund.  He explained that Mr. Smith's estate should not be responsible for any of the fees awarded because if Mr. Gardner had "diligently pursued" a transfer of supervision to New York, "most of the fees" would not have been

---

[23] The approved hours add up to 70.2 (35 + 12.3 + 22.9), not 57.9 hours, and the hours "sought" total 121.9 (74.4 + 24.6 + 22.9), not 109.6 hours.

[24] The approved hours add up to 75 (35.0 + 14.35 + 3.85 + 21.8), not 56.8 hours, and the hours "sought" total 156.8 (98.6 +28.7 +7.7 +21.8), not 138.6 hours.

incurred and Mr. Smith might have retained some of his funds. "Under these circumstances," Judge Fisher said, "it would be unfair to require his estate to pay" for Mr. Gardner's services.[25]

### D. The Third Appeal (*Smith III*)

Mr. Gardner appealed from the Superior Court's October 3, 2016, fee award concerning these three petitions. His notice of appeal stated that he "appeals only the part of the October 3, 2016 order that denied his compensation/fees as medical guardian" in Mr. Smith's case. In his brief on appeal, Mr. Gardner asked this court not to remand the case to Judge Fisher for another review of his fee petitions; instead, arguing that the existing record was "complete and well documented . . . for a decision concerning fair compensation to Gardner on his fee petitions," he urged this court to determine his compensation on the existing record itself.

After Mr. Gardner filed his brief, the District moved the court to vacate the fee award and remand the case to the Superior Court for further consideration in light of specific issues it had identified with the award. The District argued that a remand was necessary for four reasons.

First, the District pointed out that Mr. Gardner had applied for, and been awarded, fees from the Guardianship Fund for the same twenty hours of legal work

---

[25] The judge evidently applied the same reasoning to Mr. Gardner's expense reimbursements.

for which the Superior Court had, in 2013, awarded him $6,000 in fees from Mr. Smith's estate. The District sought a remand for the Superior Court to determine whether Mr. Gardner had collected that $6,000 (as his brief on appeal appeared to indicate), and if so, the effect of his failure to disclose that fact in his renewed petition for compensation from the Fund for the same work.

Second, the District asked for a remand so that Mr. Gardner could explain the discrepancies in hours and costs between the two fee petitions he had submitted for the period from June 2012 to June 2013. The District advised that Mr. Gardner's 2013 petition requested fees for 101.3 hours of services and costs of $1,027.96, while his 2016 petition sought fees for 113.8 hours of services and costs of $1,153.46, with no explanation for the difference.

Third, the District sought further findings regarding Judge Fisher's apparently mistaken determination that he already had compensated Mr. Gardner for 36.4 hours of his appellate work in *Smith I*. And fourth, the District said a remand was necessary for Judge Fisher to correct the several other mathematical and computational errors in his October 3, 2016 order.

In June 2018, this court granted the District's motion over Mr. Gardner's objection, vacated the compensation order on appeal, and remanded the case to the Superior Court for further proceedings regarding the statements made in the District's motion.

### E. The Fee Award on Remand

In March 2019, Judge Fisher issued a preliminary order on remand, in which he addressed the four issues identified by the District and recomputed his award on Mr. Gardner's three fee petitions. Judge Fisher found that Mr. Gardner had collected $6,000 in fees for twenty hours of legal work and $1,022.96 in costs from Mr. Smith's estate but had not disclosed this collection in his January 2016 fee petition seeking reimbursement for the same work and costs from the Guardianship Fund. The judge agreed that his October 3, 2016, order overcompensated Mr. Gardner as a result. Judge Fisher further found that the January 2016 fee petition contained 15 entries for services, and some additional costs, which were not included in the earlier petition for the same time period or that were for greater amounts of time than were specified previously. In addition, the judge agreed that his October 3 order contained several computational errors and that he had been mistaken about Mr. Gardner having previously been paid for 36.4 hours of work relating to his appeal in *Smith I*. Making all the necessary corrections to the three awards (which included adding compensation for the aforesaid 36.4 hours and subtracting the duplicative reimbursement for previously compensated work and costs), Judge Fisher calculated that the October 3 order *underpaid* Mr. Gardner. The judge

computed that Mr. Gardner was entitled to receive an additional payment from the Guardianship Fund in the amount of $2,004.57.[26]

Judge Fisher scheduled a hearing on June 7, 2019, to allow Mr. Gardner to address his preliminary resolution of the issues on remand. At that hearing, Mr. Gardner did not challenge Judge Fisher's determinations and corrections on remand in any respect.[27] That same day, Judge Fisher entered a final order awarding Mr. Gardner another $2,004.57 from the Guardianship Fund for the reasons stated in his preliminary order.

---

[26] Specifically, Judge Fisher calculated that he had approved an *overpayment* to Mr. Gardner totaling $3,070.53 on his January 2016 petition (this overpayment mainly reflected the erroneous charge against the Guardianship Fund for the same twenty hours of work and related expenses that were the subject of an award of $7,022.96 from Mr. Smith's estate in 2013), but that he had approved *underpayments* of $3,446.10 on the December 2015 petition and $1,629.00 on the March 2016 petition, resulting in a net *underpayment* to Mr. Gardner of $2,004.57.

[27] During the hearing, Mr. Gardner represented that an amended fee petition he had filed in November 2015 was still pending. The amendment purported to modify the fee petition he filed in July 2012, which as of 2015 had been remanded in *Smith I*. Judge Fisher had approved in part the original July 2012 petition in 2016 in an order that Mr. Gardner did not appeal. After it was raised in the June 2019 hearing, Judge Fisher denied the amendment because he believed it was untimely and because Mr. Gardner had "sought neither reconsideration of nor appeal" from the 2016 order resolving the original petition. Without addressing the timeliness argument, we conclude that Judge Fisher's denial of the amended petition—brought to his attention three years after he decided the original petition—is not properly before us on appeal because Mr. Gardner did not appeal the disposition of the original petition in 2016.

Mr. Gardner now seeks review of the Superior Court's June 7, 2019, order denying him additional compensation for his services as Mr. Smith's medical guardian.

## II.

### A. Standard of Review

Court-appointed guardians and conservators are "entitled to reasonable payment for their work, '[a]s approved by order of the court.'"[28] Such compensation normally "shall be paid from the estate of the ward or [protected] person or, if the estate of the ward or person will be depleted by payouts made under this subsection, from a fund established by the District."[29] That fund, known as the "Guardianship Fund," is a separate account within the General Fund of the District of Columbia.[30]

When a guardian petitions for compensation, the probate court must determine "whether the compensation request is reasonable."[31] "We review the denial of a compensation request for abuse of discretion and review the underlying legal

---

[28] *In re Cannon*, 278 A.3d 726, 727 (D.C. 2022) (alteration in original) (quoting D.C. Code § 21-2060(a)).

[29] D.C. Code § 21-2060(a).

[30] *Id.* § 21-2060(b).

[31] *In re Robinson*, 216 A.3d 887, 889-90 (D.C. 2019) (per curiam).

principles de novo,"[32] but we "will not upset factual determinations underpinning [compensation] awards unless they are 'plainly wrong or without evidence to support' them."[33] "In evaluating and determining a reasonable amount of counsel fees, we have held that a trial court abuses its discretion by: (1) failing to consider a relevant factor; (2) relying upon an improper factor; or (3) failing to provide reasons that support the court's conclusions."[34] However, "[o]ur scope of review [of an award of attorney's fees] is a limited one because disposition of such motions is firmly committed to the informed discretion of the trial court. Therefore, it requires a very strong showing of abuse of discretion to set aside the decision of the trial court. We limit our review to prevent squabbles over attorneys' fees from blossoming into a second major litigation."[35]

---

[32] *Id.* at 890.

[33] *In re Goodwin*, 275 A.3d 283, 286 (D.C. 2022) (quoting *In re Orshansky*, 952 A.2d 199, 209 (D.C. 2008)).

[34] *In re Est. of McDaniel*, 953 A.2d 1021, 1023-24 (D.C. 2008) (per curiam).

[35] *Lively v. Flexible Packaging Ass'n*, 930 A.2d 984, 988 (D.C. 2007) (second alteration in original) (internal quotation marks and citations omitted).

**B. Subject-Matter Jurisdiction to Order Remand in *Smith III***

"Subject matter jurisdiction concerns the court's authority to adjudicate the type of controversy presented by the case under consideration."[36]  Mr. Gardner contends that this court exceeded its subject-matter jurisdiction in *Smith III* when it remanded for consideration of issues he did not present in his appeal and the District did not present in a cross-appeal pursuant to D.C. App. R. 4(a)(3).[37]

Mr. Gardner reasons that his notice of appeal in *Smith III* specifically limited the scope of this court's jurisdiction in the appeal to the parts of Judge Fisher's October 2016 order that *denied* him compensation, as was permitted by D.C. App. R. 3(c)(1)(B).[38]  The District did not file a notice of cross-appeal.  Mr. Gardner

---

[36] *Davis & Assocs. v. Williams*, 892 A.2d 1144, 1148 (D.C. 2006) (quoting *In re J.W.*, 837 A.2d 40, 44 (D.C. 2003)).

[37] D.C. App. R. 4(a)(3) provides: "If one party files a timely notice of appeal, any other party to the proceeding in the Superior Court may file a notice of appeal within 14 days after the date on which the first notice of appeal was filed, or within the time otherwise prescribed by Rule 4(a)(1), whichever period ends later."

[38] At the time Mr. Gardner filed his appeal in *Smith III*, D.C. App. R. 3(c)(1)(B) (2021), which was based on its counterpart in the Federal Rules of Appellate Procedure, provided that a notice of appeal must "designate the judgment, order, or part thereof being appealed."  The scope of an appeal is determined by the designation in a notice of appeal (or the designations in the notices collectively, if there are multiple appellants).  *See, e.g.*, *Johnson v. Perry*, 859 F.3d 156, 167 (2d Cir. 2017) ("[T]he contents of the notice of appeal define the scope of the appellate court's jurisdiction."); *Vines v. Mfrs. & Traders Tr. Co.*, 935 A.2d 1078, 1083 (D.C. 2007).  Effective December 1, 2021, Rule 3(c)(1)(B) was amended to state that the notice of appeal must "designate the judgment—or the appealable order—from

argues that it therefore was improper for this court to remand for reconsideration of unchallenged parts of Judge Fisher's order that *approved* his compensation—even the part that inadvertently approved what concededly was a $1,800 overpayment from the Guardianship Fund that Mr. Gardner sought without disclosing his prior award and receipt of $6,000 as full payment for the same work from Mr. Smith's estate.[39]  According to Mr. Gardner, this court's remand order should have directed the Superior Court to address only those errors that had *reduced* his compensation from the Guardianship Fund.

This court granted the District's motion for remand, over Mr. Gardner's opposition, in a single-judge order, as the appeal was then in its preliminary stages. The court construed the remand motion as one in which the District conceded error on the part of the trial court and requested a remand for the trial court to consider

---

which the appeal is taken," and new Subsection 3(c)(6) was added to the Rule to provide more specifically that "[a]n appellant may designate only part of a judgment or appealable order by expressly stating that the notice of appeal is so limited. Without such an express statement, specific designations do not limit the scope of the notice of appeal."

[39] $1,800 is the amount of the overpayment resulting from 20 hours of work, at the Fund rate of $90 per hour, for which Mr. Gardner had already been compensated from the ward's estate.  The District has not challenged Mr. Gardner's receipt of that $6,000 award (or the award of the associated costs in the amount of $1,022.96) from Mr. Smith's estate, and on remand Judge Fisher did not alter that earlier award.

Mr. Gardner's arguments. Mr. Gardner did not object to the remand on the ground that it exceeded the scope of his notice of appeal and this court's subject-matter jurisdiction, and this court did not address that claim. Arguably, Mr. Gardner waived this ground for objection by failing to assert it in opposition to the remand motion; nor did he raise it in the proceedings on remand in Superior Court. But the District has not made that argument to us in this appeal and in effect has waived any waiver by choosing instead to address Mr. Gardner's contention on its merits.[40] In the exercise of our discretion, and particularly because Mr. Gardner's claim may be perceived as raising a question of subject-matter jurisdiction, we opt to do likewise.

The District argues that this court did not exceed the scope of Mr. Gardner's appeal because it merely sent the case back to the Superior Court, on the District's concession that the order on appeal was erroneous, to determine whether Mr. Gardner was owed more fees (and the Superior Court agreed that he was). We do not find that argument persuasive, however, because we did not simply remand solely for correction of errors that had reduced Mr. Gardner's total award; we vacated the entire award, and some of the errors identified for correction on remand (such as the errant approval of double payment for services and costs) had enlarged that award and were outside the scope of Mr. Gardner's appeal.

---

[40] *See, e.g., In re T.L.*, 859 A.2d 1087, 1090-91 n.6 (D.C. 2004).

We are not persuaded by Mr. Gardner's contention, however. We addressed an analogous issue in *In re Gardner*,[41] where this court also directed on remand a broader review of the trial court's fee award than the appellant, Mr. Gardner, had sought. In that case we did so sua sponte; Mr. Gardner was the only party before the court in that appeal (unlike in *Smith III* where the District actually participated in the appeal, called this court's attention to the overpayments, and expressly requested a remand). We explained our action as follows:

> We acknowledge that we usually limit our review to the issues raised by an appellant and will not broaden our gaze to examine defects in a challenged ruling that operate to the appellee's detriment in the absence of a cross-appeal. The so called "cross-appeal" rule is not jurisdictional, however, and we have held that it can yield in appropriate circumstances. *See, e.g.*, *District of Columbia v. Chinn*, 839 A.2d 701, 712 n.10 (D.C. 2003) (citing cases); *see also* D.C. Code § 17-306 (2012 Repl.). We conclude such circumstances are present in this case.[42]

As this court said in *Chinn*, "while the [cross-appeal] rule 'should not be discarded lightly,' deviation could be warranted 'to the extent necessitated by justice and the circumstances of [the particular] case.'"[43] The cross-appeal rule is "a rule of practice

---

[41] 268 A.3d 850 (D.C. 2022).

[42] *Id.* at 859 n.17.

[43] *Chinn*, 839 A.2d at 712 n.10 (second alteration in original) (quoting *Edwards v. Woods*, 385 A.2d 780, 783 (D.C. 1978)).

which generally has been followed; but [it does not] deny the power of the court to review objections urged by [the opponent], . . . if the court deems there is good reason to do so."[44]

The interests of justice and the circumstances of *Smith III* warranted relaxation of the cross-appeal rule in that appeal. There was no formal cross-appeal in *Smith III* because the District was not a party or a participant in the trial court proceedings relating to the fee petitions addressed in that appeal and hence was not a party that could notice an appeal or cross-appeal.[45] The ward likewise was not a party in the trial court (and could not have been, as he was deceased). Nonetheless, the purposes of the cross-appeal rule were served in *Smith III*, and Mr. Gardner was not prejudiced by the District's failure to file a formal cross-appeal. As the Supreme Court has said with respect to the counterpart provision of the Federal Rules of Appellate Procedure, the cross-appeal rule implements principles of "party presentation" to the appellate court and notice to the opposing side of the issues that the court will be

---

[44] *Langnes v. Green*, 282 U.S. 531, 538 (1931).

[45] *See* D.C. App. R. 3(a)(1) ("If a timely notice of appeal is filed by a party, *any other party to the proceeding in the Superior Court* may file a notice of appeal within the time prescribed by Rule 4." (emphasis added)); *accord* D.C. App. R. 4(a)(3), *supra* note 37.

asked to decide.[46] The cross-appeal requirement "is not there to penalize parties who fail to assert their rights, but is meant to protect institutional interests in the orderly functioning of the judicial system, by putting opposing parties and appellate courts on notice of the issues to be litigated . . . ."[47] The District's motion for remand fulfilled the purposes of the rule and was not untimely under the circumstances, and thus was the "functional equivalent of the formal notice of appeal demanded" by the appellate rules.[48] To be sure, the motion was not in form a cross-appeal notice; but the Supreme Court has held that even a party's brief on appeal may serve the function and satisfy the formal requirements of a notice of appeal.[49] And we do not consider the District to have been dilatory in filing its motion and identifying the problems with the compensation order on appeal in *Smith III*. As a practical matter, because the District did not participate in the trial proceedings, it was not in a position to

---

[46] *See Greenlaw v. United States*, 554 U.S. 237, 244 (2008) (explaining that "[t]he cross-appeal rule . . . is both informed by, and illustrative of, the party presentation principle[]" under which courts generally confine themselves to the issues as the parties present them); *El Paso Nat. Gas Co. v. Neztsosie*, 526 U.S. 473, 480 (1999) (noting "the institutional interests in fair notice and repose that the rule advances").

[47] *El Paso Nat. Gas Co.*, 526 U.S. at 481-82.

[48] *Smith v. Barry*, 502 U.S. 244, 248 (1992) (internal quotation marks omitted).

[49] *See id.* at 248-49.

identify those problems until the trial court record was available for its review and Mr. Gardner had filed his appellate brief. Mr. Gardner had ample opportunity to respond to the motion and to address the issues identified by the District, including those errors that had benefitted Mr. Gardner by enlarging the award (e.g., the errant approval of double payment for services and costs).

If the cross-appeal rule were not relaxed where a court-appointed fiduciary is appealing an award of compensation from either an incapacitated individual's estate or the Guardianship Fund, the appellate court almost inevitably would be left with a one-sided presentation and the ward or the Fund would be prejudiced. In the typical case that comes to us, there was no party protecting the ward's or Fund's interests in the trial court proceedings, and there is no party doing so on appeal. That, for example, was the situation in *In re Gardner*, *supra*.[50] Rigid adherence to a cross-

---

[50] We consider it fortunate that the District entered its appearance in the *Smith* appeals, albeit only in an amicus role. But this is an infrequent occurrence in these cases. We are moved to observe that the courts and the interests of justice would benefit if the Attorney General were to intervene more frequently on behalf of the District in probate court and appellate proceedings on fee petitions and awards. *See* Super. Ct. Civ. R. 24; *EMC Mortg. Corp. v. Patton*, 64 A.3d 182, 185 (D.C. 2013) ("This court has previously permitted entities that were not a party to proceedings in the trial court but were aggrieved by a ruling of the trial court to intervene for purposes of pursuing an appeal."). The District has a direct interest at stake in protecting the assets of the Guardianship Fund, which is a separate account within the General Fund of the District of Columbia, *see* D.C. Code § 21-2060(b), and an interest as *parens patriae* in protecting the assets of incapacitated individuals who are unable to fend for themselves.

appeal notice requirement in these circumstances would thwart the interests of justice rather than serve them.

Furthermore, we do not believe that court-appointed guardians and conservators have reasonable grounds to insist on limiting the appellate scrutiny of their fee awards on appeal merely because there is no party opposing them. They are fiduciaries, and are held to the standards of a fiduciary; it is a violation of the trust reposed in them to take advantage of the absence of opposition. The trial court has plenary authority to examine every aspect of their requests for compensation from the ward's estate or the Guardianship Fund, even in the absence of objection by an opposing party. When the fiduciaries ask this court on appeal to review a reduction of their requested compensation, we think it unreasonable for them to insist that we conduct that review with blinders on. The cross-appeal rule was not meant to apply in this sort of situation, where there is no adversary to protect the interests at stake and it is the court itself that bears the onus of doing so.

But here we had the functional equivalent of a cross-appeal by an opposing party with an interest at stake. That sufficed. We conclude that this court did not exceed its jurisdiction when it remanded in *Smith III* for the Superior Court to address the deficiencies in its compensation order. The Superior Court therefore did not violate Mr. Gardner's rights by doing so.

### C. Payment From The Guardianship Fund Without Depletion of the Ward's Estate

Mr. Gardner asserts that Judge Fisher erred by ordering payment from the Guardianship Fund prior to the depletion of Mr. Smith's assets. He relies on D.C. Code § 21-2060(a), which states, in pertinent part, that a guardian's "[c]ompensation shall be paid from the estate of the ward or person or, if the estate of the ward or person will be depleted by payouts made under this subsection, from a fund established by the District." But for the following reasons, we conclude that Mr. Gardner's three final fee petitions before Judge Fisher did not entitle him under Section 21-2060(a) to receive payment of his compensation awards in whole or part from Mr. Smith's estate.

Sometime after Mr. Smith's death in 2013, Mr. Gardner discovered that there was a balance of $4,384.17 in his nursing home account, which he noted in his March 2016 petition. (No other significant assets in Mr. Smith's estate have been identified.) In his December 2015 and January 2016 petitions, however, Mr. Gardner represented that Mr. Smith had "no assets" (or "no contingent assets" and "insufficient assets to pay the guardian"), and accordingly he specifically requested an award only from the Guardianship Fund. We agree with the District that, in so doing, Mr. Gardner waived an argument that Judge Fisher should have made the award on either of those petitions payable in whole or part from

Mr. Smith's estate. But for the reasons we now discuss, it would not matter even if there had not been such a waiver.

In his March 2016 fee petition, Mr. Gardner requested over $15,000 (and the trial court eventually awarded him a total of $7,173). Acknowledging that his fee request exceeded Mr. Smith's assets in his nursing home account, Mr. Gardner asked the Superior Court to award him only $3,480 from Mr. Smith's estate (i.e., for 11.6 hours of work at $300 per hour), which would not have fully depleted the account, and the remainder from the Guardianship Fund (at the lower rate of $90 per hour). As recounted above, Judge Fisher denied this request, deeming it "unfair" under the circumstances to pay Mr. Gardner anything from Mr. Smith's estate in light of his failure to diligently transfer the case to New York.

We do not rely on Judge Fisher's "unfairness" rationale to reject Mr. Gardner's contention. The point of the reductions that Judge Fisher made in the compensation Mr. Gardner requested was to render the resulting award a fair one, and the statute presumes that fair compensation "*shall* be paid from the estate of the ward" if it will not deplete the estate, unless a statutory exception applies. "Unfairness" of the kind Judge Fisher identified is not such an exception.

But, as the District points out, the statute contains a provision that did preclude Mr. Gardner's application for payment from Mr. Smith's estate as a matter of law. Although Subsection (a-1) of D.C. Code § 21-2060 appears to have been overlooked

by both Mr. Gardner and Judge Fisher, it states in pertinent part that "[t]he estate of a person or ward shall be presumed to be depleted for purposes of this chapter, and all compensation, expenses, and payouts made under this section shall be paid from [the Guardianship Fund] . . . [i]f the person or ward qualifies for federal Supplemental Security Income under Title XVI of the Social Security Act[.]"[51]  As Mr. Gardner himself had represented to the Superior Court, Mr. Smith qualified for and received Supplemental Security Income.

Mr. Gardner argues that we should not consider the District's invocation on appeal of Subsection (a-1) because it is a new argument that was not presented to the trial court.  It is well-settled, however, that "[w]here there will be no procedural unfairness, we may affirm a judgment on any valid ground, even if that ground was not relied upon by the trial judge or raised or considered in the trial court."[52]  We see no unfairness in affirming on the ground that Subsection (a-1) requires affirmance

---

[51] D.C. Code § 21-2060(a-1)(1).  The District also cites Subsections (a-1)(2) and (4), which similarly provide for a presumption of depletion if the ward qualifies for Medicaid or if the ward qualifies for Veterans benefits and such benefits constitute the ward's "sole source of income[.]"  However, we perceive that there may be a disputed issue of fact as to whether Mr. Smith qualified for Medicaid at the relevant time, and it appears that his Veterans benefits were not his sole source of income (given that he also received social security income).

[52] *Grimes v. District of Columbia*, 89 A.3d 107, 112 n.3 (D.C. 2014) (quoting *Nat'l Ass'n of Postmasters of the U.S. v. Hyatt Regency Wash.*, 894 A.2d 471, 474 (D.C. 2006)); *see also Wagner v. Georgetown Univ. Med. Ctr.*, 768 A.2d 546, 559-60 (D.C. 2001).

as a matter of law, because Mr. Gardner does not dispute the material fact of Mr. Smith's qualification for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, and he has had the opportunity to brief the significance of this point.

Mr. Gardner contends that Mr. Smith "no longer qualified" for SSI benefits as of the filing of the March 2016 fee petition because "Mr. Smith was dead," or, in the alternative, that the presumption of depletion was rebutted by the fact of Mr. Smith's demise. Thus, Mr. Gardner argues, Subsection (a-1) was not applicable. We disagree. Up until the day of Mr. Smith's death, his estate was presumed depleted as a matter of law because he qualified for SSI benefits. The fact of his death did not change the amount of funds in his estate, the source of those funds, or any other debts or claims against Mr. Smith's estate (about which we have little to no information). While Mr. Smith may no longer have actively "qualified" for SSI benefits after his death, the presumption of a depleted estate continues for purposes of final compensation of the guardian.[53] Mr. Gardner proffers no facts that could have supported an argument before the trial court to rebut that presumption.

---

[53] We note that a guardianship for an incapacitated individual terminates upon the death of the ward. D.C. Code § 21-2048. By court rule, a guardian's "final petition for compensation must be filed no later than 60 days after termination of the guardianship." Super. Ct. Prob. R. 322(d)(1) (formerly Rule 308(c)(1) (2022)); *In re Estate of Yates*, 988 A.2d 466, 469 (D.C. 2010). Thus, fee petitions filed over

Mr. Gardner further argues that "[t]he purpose of the (a-1) presumption of depletion is for the court not to use the ward's estate for compensation if the use of the assets would create a 'substantial financial hardship' on the ward," citing Subsection (a-1)(6); and that Mr. Smith obviously would not suffer such a hardship if compensation were paid from his remaining funds after his demise. But Mr. Gardner misreads Subsection (a-1)(6); it states that "*[i]f the circumstances listed in paragraphs (1), (2), (3), (4), and (5) of this subsection do not apply*, the person or ward may establish, by affidavit or other proof satisfactory to the court, the inability to pay any costs without substantial financial hardship to himself or herself or his or her family." (Emphasis added.) This does not mean that any of the first five paragraphs is rendered inapplicable if the sixth paragraph is not independently satisfied as well. The sixth paragraph is simply an alternative ground for applying the presumption of depletion. While there might be sound policy reasons for compensating a guardian from a deceased ward's estate—rather than from public funds—after the ward no longer has need of it, this rationale would apply irrespective of whether such payment would deplete the estate. We decline to adopt such a rule in light of the statutory silence on the effect of the ward's death.

---

two years after a ward's death (like the March 2016 petition at issue here) should, at the least, be rare occurrences.

Mr. Gardner also asserts that Subsection (a-1) did not apply to his March 2016 fee petition because the term "estate of a person or ward" in that subsection "refers to a 'conservatorship estate' and *not* a 'decedent's estate.'" But Mr. Gardner makes no argument in support of this bare assertion, and we do not find it persuasive. As used in Section 21-2060 (and elsewhere in the Guardianship Act), "estate" is a defined term; it "means the property of the individual whose affairs are subject to this chapter."[54] That definition is broad enough to encompass the funds left in Mr. Smith's nursing home account after his death.

We conclude that Judge Fisher did not err in denying Mr. Gardner's request to be paid, in part, from Mr. Smith's estate.[55]

## D. Imposition of the Guardianship Fund Rate Cap

Mr. Gardner contends that the Superior Court failed to adequately justify compensating him at $90 an hour from the Guardianship Fund, instead of at his considerably higher $300 hourly rate. In making this argument, Mr. Gardner barely acknowledges that $90 an hour is the fee cap imposed by the District of Columbia

---

[54] D.C. Code § 21-2011(6).

[55] Because the estate should have been presumed depleted as a matter of law, we do not reach the District's argument that the statute does not require partial fee payment from an estate before turning to the Guardianship Fund when full payment would deplete the estate funds.

Courts' Joint Committee on Judicial Administration on all fees awarded from the Guardianship Fund.[56]   Nonetheless, he argues that the Superior Court abused its discretion by applying the rate cap without independently assessing whether $90 per hour was reasonable considering the prevailing market rates in the community. Mr. Gardner waived this argument by not only failing to challenge the Guardianship Fund's $90 hourly rate as unreasonable in the Superior Court, but also by expressly asking to be paid at that rate in each of his three fee petitions.[57]   But, as it happens, during the pendency of this appeal this court squarely rejected Mr. Gardner's same contention in another case, *In re Goodwin*.[58]   There, we explained that the Joint Committee has the authority under law to cap the rates at which compensation would be paid from the Guardianship Fund, that "the $90 cap reflects the Joint Committee's judgment about what a reasonable fee is—in light of fiscal realities and limited public funding—and [that] nothing in our precedents precludes it from fixing such

---

[56] *See* D.C. Superior Court, Case Management Plan for the Probate Division at 48 (July 31, 2014), https://www.dccourts.gov/sites/default/files/matters-docs/Probate-Division-Case-Management-Plan.pdf; https://perma.cc/5M5P-NRU5.

[57] *See, e.g.*, *District of Columbia v. Patterson*, 667 A.2d 1338, 1347-48 (D.C. 1995) (declining to consider an argument that the plaintiffs had an opportunity to raise but failed to raise in their fee petition in the trial court).

[58] 275 A.3d 283, 284 (D.C. 2022).

caps as a policy matter."[59]  We accordingly held that the probate court did not exceed

its authority or abuse its discretion by reducing Mr. Gardner's fees to $90 per hour

in compliance with the Joint Committee's restriction on funds drawn from the

Guardianship Fund.[60]  We reach the same conclusion here.

### E.  Failure to Dispose of Mr. Gardner's Fee Petitions Within 30 Days of Filing

At the times that Mr. Gardner filed his fee petitions and Judge Fisher

considered them, Superior Court Probate Rule 308(i)(1) provided that "[t]he [c]ourt

shall enter an order disposing of any request for payment from the Guardianship

[F]und . . . within 30 days of the filing of such request."[61]  Mr. Gardner proposes

---

[59] *Id.* at 288.  "It is not for us," we stated, "to second-guess that policy decision, committed to the discretion of the Joint Committee."  *Id.*

[60] *Id.*  Obviously, if Mr. Gardner had deemed the rate cap unreasonably low, he was not compelled to seek a court appointment to serve as a guardian or conservator subject to that cap.  Mr. Gardner's invocation of *In re Robinson* for the proposition that "the fact that $90 is the hourly rate paid to guardians when an estate's assets are depleted does not mean that rate should be viewed as the reasonable rate for all non-legal guardianship services" is inapposite here—in that case, the trial court had reduced Mr. Gardner's $300 hourly rate to $90, suggesting that $90 was reasonable *by analogy* to the Guardianship Fund fee cap, but was not actually paying fees from the Fund.  216 A.3d 887, 891-92 (D.C. 2019) (per curiam).

[61] Super. Ct. Prob. R. 308(i)(1) (2022).  The Superior Court Probate Rules were substantially amended in August 2022.  *See* D.C. Super. Ct., Rule Promulgation Order 22-03 at 1 & n.1 (2022), https://www.dccourts.gov/sites/default/files/2022-03/Promulgation-Order-22-03-Amending-Super-Ct-Prob-R.pdf; https://perma.cc/8CDZ-N5K5. Appendix E to the amended Probate Rules, added in September 2022, now sets forth standards for petitions for compensation under D.C.

that, because the Superior Court did not render a decision on his fee petitions within that 30-day period, they should be deemed to have been granted *in full*, regardless of any defects or overreaching, together with interest and other monetary relief. This is another argument that this court rejected in *Goodwin*—explaining there that "Rule 308(i)(1)'s thirty-day deadline specifies no remedy for when a court fails to decide a fee petition within that timeframe, and when a statutory or rule-based deadline 'does not specify a consequence for noncompliance,' our 'courts will not in the ordinary course impose their own coercive sanction.'"[62] We adhere to that holding here; because the Rule did not provide for a sanction or adjustment of any kind for the court's failure to rule on a compensation petition within 30 days, let alone a full award of all requested fees with interest and other relief, we view the 30-day deadline as merely directory (or, we might say, precatory) rather than mandatory.[63]

---

Code § 21-2060. *See* D.C. Super. Ct., Administrative Order 22-25 (Sept. 23, 2022), https://www.dccourts.gov/sites/default/files/2022-09/Administrative_Order_22-25_Standards_for_Submission_of_Petitions_for_Compensation_Vacating%2022-22.pdf; https://perma.cc/Y7JN-UB5S. These standards provide that the Court will pay interest on petitions that have not been paid within 45 days after the time for filing an opposition has passed and the petition is deemed complete. *Id.* at 3. No argument has been made to us that this provision applies retroactively to petitions submitted before the Probate Rule amendments.

[62] 275 A.3d at 289 (quoting *Dolan v. United States*, 560 U.S. 605, 611 (2010)).

[63] *See In re Morrell*, 684 A.2d 361, 370 (D.C. 1996) ("Nothing in the text of the rules, however, specifies the result of a Hearing Committee's failure to adhere to the time limit, so we presume that the rule is directory, rather than mandatory.");

Accordingly, we reject Mr. Gardner's claim that the delay in rendering awards on his fee petitions entitled him to any of the relief he proposes.

## F. The Awarded Fees

Mr. Gardner contends that Judge Fisher abused his discretion in cutting his fee requests for appellate work in *Smith I* and *Smith II*, time spent traveling to and from New York in connection with four visits in nine months to Mr. Smith at the nursing home, and time spent in connection with the preparation and explanation of his billing. With one qualification that will require clarification of the fee award for appellate work on remand, we disagree with Mr. Gardner and conclude that there was no abuse of discretion here.

### 1. Appellate Work

In his December 2015 fee petition, Mr. Gardner sought fees for 74.4 hours of work related to his appeal in *Smith I*. He requested fees for an additional 75.8 hours for *Smith I* appellate work in his January 2016 petition. And in his March 2016 petition, Mr. Gardner submitted a fee request for 98.6 hours of work on his appeal in *Smith II*—for a total of 248.8 hours of appeal-related work. In his final order on remand, Judge Fisher granted these requests in part; we understand him to have

---

*Spicer v. D.C. Real Est. Comm'n*, 636 A.2d 415, 418 (D.C. 1993) ("[S]tatutory time limits on agency decision making, where the statute fails to provide for a sanction, are 'directory rather than mandatory.'" (quoting *Hughes v. D.C. Dep't of Emp. Servs.*, 498 A.2d 567, 571 n.8 (D.C. 1985))).

awarded fees for 35 hours of appellate work on each of the three petitions (for a total of 105 hours)—of which 70 hours were for *Smith II* and the rest were for his partial success (prevailing on one of the two issues) in *Smith I*. This was, obviously, substantially less than Mr. Gardner sought.

We perceive what may be a small but not insignificant computational mistake or inconsistency with respect to the award of fees for Mr. Gardner's work on the *Smith I* appeal, and we will remand for the court to clarify that portion of the award. (We have no such concern with the fee award for work on the *Smith II* appeal.)[64]

Mr. Gardner argues that he was entitled to full payment for his appellate work in *Smith I* and *Smith II* because he "substantially prevailed" and ultimately was vindicated in the appeals. Setting aside that *Smith I* was not a complete success, as Judge Fisher properly took into account, this is the same contention that this court

---

[64] Regarding the award for *Smith I*, Judge Fisher originally appeared to believe that roughly 45 hours (i.e., half of 70 hours plus 10 hours) were reasonably compensable in light of the fact that Mr. Gardner was only partially successful in that appeal. As a result, Judge Fisher initially awarded 10 hours of compensation on top of the 36.4 hours he (mistakenly) believed to have already been compensated. It is unclear whether the order on remand accounted for the 10 hours originally awarded in 2016, or if the 35 hours awarded in 2019 supplanted the earlier award in Judge Fisher's calculations, for a reduced total of 35 instead of 46.4 (or 45) hours. We remand for the Superior Court to clarify the total number of hours awarded for Mr. Gardner's work on *Smith I* and, if there was a reduction in that amount between the October 2016 award and the June 2019 award, for the court to either correct the difference or adequately explain it.

squarely rejected in *In re Gardner*. There we emphasized that we "did not endorse the . . . rule that whenever a court-appointed fiduciary prevails in a dispute about payment for court-appointed work, they are entitled to payment for any and all work done to obtain compensation."[65] As always, "approval is contingent on an assessment of the reasonableness of a court-appointed fiduciary's fee petition."[66] The present case is no exception.

Judge Fisher concluded that Mr. Gardner expended substantially more hours on his appeals in *Smith I* and *Smith II* than were reasonably compensable. Although Mr. Gardner attacks the trial court's ruling as arbitrary and unsupported by the record, we disagree. In fact, the judge carefully reviewed the record, considered the relevant factors, relied on no improper factor, and supported his ruling with reasonable justification.

Among other things, Judge Fisher reviewed this court's opinions and Mr. Gardner's appellate briefs in *Smith I* and *Smith II*. He concluded that the issues presented in those cases were not "so complex that they merited nearly as much time as Mr. Gardner insists he spent"; all the more so, the judge observed, because in earlier petitions Mr. Gardner had already billed for (and had been awarded fees for)

---

[65] 268 A.3d 850, 856 (D.C. 2022).

[66] *Id.* at 857.

21 hours of trial-level work researching and writing on the same issues as on appeal. Mr. Gardner asserts that Judge Fisher did "not have an appreciation of the complexity of the issues" in *Smith I* and *II*, but that assertion is both unsupported and contradicted by Judge Fisher's investment of time in reviewing those cases and the appellate briefs.

As we have summarized earlier in this opinion, that review was not all that Judge Fisher took into consideration. First, he also took into account the fact that Mr. Gardner was unsuccessful in one of the two issues he raised in *Smith I*. Mr. Gardner does not suggest it was improper to take his partial success into consideration, and we do not find it so. The degree of success is highly material in computing a fee award; in general, like an opposing party in fee-shifting litigation, the Fund or the ward generally should not be required to pay for the prosecution of unsuccessful claims.[67]

Second, Judge Fisher identified "several specific categories of excessive charges," namely, Mr. Gardner's practice "[t]hroughout" his petitions of billing "at

---

[67] *See, e.g.*, *George Hyman Constr. Co. v. Brooks*, 963 F.2d 1532, 1535 (D.C. Cir. 1992) ("When a party achieves 'only partial or limited success,' however, then compensation for all of the 'hours reasonably expended on the litigation as a whole . . . may be an excessive amount.'" (omission in original) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983)); *Shore v. Fed. Exp. Corp.*, 42 F.3d 373, 381 (6th Cir. 1994) ("It is entirely proper for a court to reduce fees in cases of limited success[.]").

attorney rates for administrative tasks that [were] either non-compensable or compensable at a lower hourly rate."[68] These included "[t]asks such as collating, filing, copying, and mailing documents," which the judge noted "are disallowed even when billed at the rate of a legal assistant."[69] For example, in his March 2016 fee petition, Mr. Gardner billed at the rate of $90 per hour for having "labeled and copied exhibits" and "made copies" of briefs and other pleadings for filing and sharing with interested parties, "time stamped documents," "prepared . . . cover pages for Brief," "had brief and Appendix bound for filing at FedEx Office," "[m]ailed brief & appendix to parties," and "electronically filed" various documents. We consider it unacceptable for a court-appointed fiduciary to charge for such

---

[68] Mr. Gardner's complaint on appeal that Judge Fisher failed to consider his claim to have exercised billing discretion thus is patently meritless.

[69] *See, e.g.*, *Hampton Cts. Tenants Ass'n v. D.C. Rental Hous. Comm'n*, 599 A.2d 1113, 1118 n.14 (D.C. 1991) ("Hours are not reasonably expended . . . if an attorney performs tasks that are normally performed by paralegals, clerical personnel or other non[-]attorneys." (quoting *Action on Smoking & Health v. Civ. Aeronautics Bd.*, 724 F.2d 211, 220-21 (D.C. Cir. 1984))); *Role Models Am., Inc. v. Brownlee*, 353 F.3d 962, 973 (D.C. Cir. 2004) ("We do not understand why attorney or even legal assistant skills were required for this job [filing]. '[P]urely clerical or secretarial tasks should not be billed at a paralegal rate regardless of who performs them.'" (second alteration in original) (quoting *Missouri v. Jenkins*, 491 U.S. 274, 288 n.10 (1989))).

activities at a rate even close to $90 per hour. Judge Fisher rightly adjusted his fee award in light of these charges.[70]

Third, Judge Fisher also considered that Mr. Gardner sought compensation for hours spent on a variety of fruitless efforts he made in the appellate proceedings to oppose the District's participation and strike its filings and to move for reconsideration of this court's decision in *Smith I* or to recall our mandate.[71] Judge Fisher reasonably found that these unsuccessful efforts were undeserving of

---

[70] To be clear, this court has stated that "[t]he notion of a blanket rule precluding a guardian from seeking compensation for tasks that might be called administrative or clerical is at odds with our 'expansive view of the kind of duties that are compensable under the Act[.]'" *In re Wilson*, 277 A.3d 940, 946 (D.C. 2022) (quoting *In re Weaks*, 224 A.3d 1028, 1034 (D.C. 2020)). Some of these tasks are compensable, "albeit at a rate lower than what attorneys [or paralegals and other legal assistants] charge." *Id.* "An attorney may choose not to hire support staff to do this work for them, but that decision will not justify billing such work at the attorney's hourly rate." *Gardner*, 268 A.3d at 859 n.15; *see also In re Brown*, 211 A.3d 165, 169 & n.5 (D.C. 2019) ("[C]ertain tasks are non-legal, more appropriately billed at a paralegal rate, or excluded altogether. . . . [T]asks such as 'organizing folders, document preparation, copying, and updating a case list' are more appropriately considered clerical, not paralegal, tasks and are thus not compensable as attorney's fees." (quoting *Vining v. District of Columbia*, 198 A.3d 738, 754-55 n.20 (D.C. 2018))).

[71] *See* note 20, *supra*. Judge Fisher's enumerated examples add up to 21.6 hours. In its brief on appeal, the District computes that such activities accounted for a total of 57 billed hours in Mr. Gardner's fee petitions. Whatever the exact number of hours, Judge Fisher appropriately took into account that Mr. Gardner billed extensively for time spent on appellate litigation tactics that did not advance the presentation of the merits.

compensation because they could not reasonably be construed as promoting the objectives of the Guardianship Act.[72]

For these reasons, we conclude that Judge Fisher did not abuse his discretion in determining the reasonable, compensable time that Mr. Gardner expended in the *Smith I* and *II* appeals based on the relevant considerations.

## 2. Fee-Petition Work

In his March 2016 fee petition, Mr. Gardner asked for 28.7 hours in fees for preparing prior billing statements and an additional 7.7 hours in fees spent preparing for a half-hour hearing held in November 2015 on the fee petitions that had been at issue in *Smith I*. This was 36.4 hours in total, all billed by Mr. Gardner at the $90 per hour rate; thus, Mr. Gardner was seeking over $3,200 in fees just for his prior fee-petition work. As noted above, some of this work was performed to correct defects and errors that Mr. Gardner himself had made in his earlier billing statements. It is unreasonable for a fiduciary to expect payment for such self-generated work.[73] Moreover, some of this work was clerical in nature; for instance, Mr. Gardner sought to be compensated at $90 per hour for mailing and electronically

---

[72] *See Smith II*, 138 A.3d at 1186 (quoted in note 14, *supra*).

[73] *See Gardner*, 268 A.3d at 861 ("Where a fiduciary fails in the first instance to give a trial court complete or accurate information in their fee petition and creates more work for himself and the court, he cannot reasonably expect to be paid in full for this self-generated work.").

filing his petitions for compensation. And why Mr. Gardner found it necessary to expend some 28 hours on the preparation of his fee petitions (which should be a routinized and automated administrative task), plus several more hours in preparation for the post-*Smith I* hearing, was and is unexplained. Judge Fisher reasonably found the entire request exorbitant. We conclude that Mr. Gardner has not made the strong showing necessary to establish that Judge Fisher abused his discretion by awarding Mr. Gardner compensation (at the full $90 per hour rate) for half of the time.

### 3. Travel Time

Finally, Mr. Gardner sought compensation for around 50 hours of round-trip travel by car in four visits that he made in a period of nine months to visit Mr. Smith at his nursing home. Finding that this travel time was disproportionately expensive, involved the most minimal contact by Mr. Gardner with Mr. Smith and his care givers, did not benefit Mr. Smith, and should have been avoided because Mr. Gardner should have taken the steps necessary to transfer Mr. Smith's conservatorship or guardianship to New York, Judge Fisher awarded Mr. Gardner only half the travel-time compensation he requested. The judge's determinations were all supported by the evidence and the record of the conservatorship. We are satisfied that Judge Fisher did not abuse his discretion in concluding that

Mr. Gardner's travel was excessive and unwarranted, and in reducing his compensation for it accordingly.

### III. Conclusion

For the foregoing reasons, we affirm the fee awards of the Superior Court on Mr. Gardner's petitions filed in December 2015, January 2016, and March 2016 in all respects except for the hours of appellate work on *Smith I* awarded to Mr. Gardner. As to that remaining matter, we remand for the limited purpose explained in note 64 *supra*.

*So ordered.*